IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| FRED ADAMI, on behalf of himself and all others similarly situated,<br><br>              Plaintiff,<br><br>     v.<br><br>CARDO WINDOWS, INC. d/b/a "Castle, 'The Window People'" et al.,<br><br>              Defendants. | HONORABLE JEROME B. SIMANDLE<br><br><br>Civil No. 12-2804 (JBS/JS)<br><br><br><br>          **OPINION** |

APPEARANCES:

Richard S. Hannye, Esq.
HANNYE LLC
128 West Cottage Avenue
Haddonfield, NJ 08033
     Attorney for Plaintiffs

Kenneth Goodkind, Esq.
Peter J. Tomasco, Esq.
Michael D. Homans, Esq.
FLASTER GREENBERG P.C.
Commerce Center
1810 Chapel Avenue West
Cherry Hill, NJ 08002
     Attorneys for Defendants


**SIMANDLE, Chief Judge:**

I.    INTRODUCTION

This matter comes before the Court on Plaintiff's[1] motion for final certification of an FLSA collective action. [Docket Items 199, 205.] Only one named Plaintiff (Fred Adami) and two Opt-In Plaintiffs remain. This action arises from Defendants' alleged mischaracterization of its window installers as independent contractors. Plaintiff Fred Adami maintains claims for unpaid overtime and all other relief they are due under the Fair Labor Standards Act, the New Jersey State Wage and Hour Law, and the New Jersey Construction Industry Independent Contractor Act, as well as a claim for unjust enrichment. The Court previously granted Plaintiffs' motion for conditional certification of a collective action under the Fair Labor

---

[1] This Court held a hearing on this motion on March 2, 2016, at which the parties raised Named Plaintiff Jack Varner's uncertain status as a party to the case. Plaintiffs' counsel, Richard S. Hannye, Esq., represented that he has heard through Mr. Varner's wife and other of Cardo's window installers that Mr. Varner has gone back to work for Cardo Windows and wishes to withdraw from this action. Michael D. Homans, Esq., counsel for Defendants, received an email purporting to come from Mr. Varner to that effect, which message he forwarded to Mr. Hannye. Mr. Hannye was unable to confirm this with Mr. Varner. The Court ordered Mr. Varner to communicate his intentions in writing to Mr. Hannye within ten days or he would be stricken as Plaintiff and Class Representative in the Action. [Docket Item 220.] After Mr. Varner's time to respond expired, the Court struck Mr. Varner as a party and dismissed his claims. [Docket Item 222.] Accordingly, the Court will construe Plaintiffs' motion, originally submitted on behalf of both Plaintiff Adami and Plaintiff Varner, to concern only Plaintiff Adami, since Mr. Varner has withdrawn as a Plaintiff.

Standards Act but for the reasons discussed below, the Court
will now decertify Plaintiff's collective action.

## II.  BACKGROUND

### A. Factual Background

Defendant, Cardo Windows, Inc. ("Cardo") does business
under the trademark, "Castle the Window People." (Deposition of
Roderick J. Arce on January 14, 2013 ("Arce Dep.") 149:3-7.)
Cardo sells and installs windows in multiple states including
New Jersey, Pennsylvania, Delaware, Massachusetts, Rhode Island,
Vermont, New Hampshire, Connecticut, New York, and Ohio. (Arce
Dep. 149:8-18.) Cardo maintains warehouses and sales facilities
in Mount Laurel, New Jersey; Cedar Grove, New Jersey;
Mechanicsburg, Pennsylvania; East Berlin, Connecticut; and
Boston, Massachusetts. (Certification of Christopher Cardillo,
Sr. ("Cardillo Cert.") [Docket Item 210-6] ¶ 4.) Defendants
contend that each of the five different facilities operates on
its own schedule and is operated by different people. (Cardillo
Cert. ¶ 12.)

Named Plaintiff Fred Adami has alleged that he worked 10 to
12 hours per day installing windows for Cardo from March 2001 to
June 2012. (Deposition of Fred Adami ("Adami Dep.") 113:4-12.)
Adami primarily completed work orders in New Jersey. (Adami Dep.
257:11-16.) He completed work for Cardo as a sole proprietor and
signed an agreement characterizing his relationship with Cardo

as one of an independent contractor. (Adami Agreement dated
March 1, 2001 [Docket Item 210-20.])

Meanwhile, Opt-In Plaintiff Kevin Kern worked only nine
days total for Cardo during the relevant time period. (Kern Re-
cap sheets [Docket Item 210-8] at 2-3.) Opt-In Plaintiff
Tadelisz Czubernat worked with Cardo in 2011 and 2012, but never
for more than 11 days in any month during that time period.
(Deposition of Tadelisz Czubernat ("Czubernat Dep.") 48:15-19,
53:4-12, 54:8-21, 58:13-11; see also Czubernat Re-cap sheets
[Docket Item 210-10] at 2.)[2]

Cardo's installation work crews consist of both
"installers" and "helpers." For efficiency, Cardo installation
managers prefer crews with two or three people. (Arce Dep.
23:10-22.) A crew consists of an installer and one or more
helpers. (Arce Dep. 23:20-22.) According to Plaintiffs, the only
difference between installers and helpers is that installers
have workers' compensation liability insurance, a driver's
license, a work truck, tools, and equipment, while helpers
generally lack any of the above. Otherwise, helpers complete the
same tasks as the installers with few exceptions. (Arce Dep.
13:22-24; 15:7-18.) Helpers work for, are selected by, and are
paid by the installer. Each installer has discretion over the

---

[2] The record does not identify in which cities and states Kern
and Czubernat installed windows for Cardo.

amount he pays his helpers. (Adami Dep. 263:2-20; Varner Dep. 152:4-12; Deposition of Kevin Kern ("Kern Dep.") 26:9-27:6.) Cardo provides installation crews with materials needed for each job and if Cardo does not have the needed materials, installation crews purchase the material for future reimbursement by Cardo. (Arce Dep. 59:23—25; 60:1—3; 61:6-18.)

Cardo is frequently selecting new installers. When seeking new installers, Cardo's primary requirement is that the applicant have workers' compensation insurance, a pickup truck, and the tools necessary to install windows. (Arce Dep. 81:5-20.) Applicants with experience installing windows, but without a truck or tools, are generally offered a job as a helper. (Adami Dep. 267:1-12.) Nearly all of the window installers Cardo hires have prior experience in the field. (Arce Dep. 81:14-20.)

Plaintiff Adami asserts that Cardo exercises significant control over the day-to-day operations of the installers. Cardo allegedly requires installation crews to display signage on their trucks and wear apparel with Cardo's logo, indicating they work for Cardo. (Arce Dep. 47:7-16; 47:20-25; 48:1.) Cardo's standard sales pitch to customers is that "all of our installers work only for Castle." (Arce Dep. 151:8-18.) Cardo also requires its installers to tell customers they work for Cardo and discourages installers from telling customers they are independent contractors because Cardo sells its products with

5

the understanding that Cardo manufactures, sells, and installs its own windows. (Arce Dep. 55:24-25; 56:1; 57:8-22.) Plaintiff contends that Cardo installation managers meet with the installers in the warehouse or meeting room for five to seven minutes to discuss their work the day before. (Arce Dep. 49:4-15.) Additionally, management provides installation crews with a job packet each day which includes a detail sheet, an office cover sheet, a copy of the customer contract with Cardo, a copy of the Cardo salesman's window measurement sheet, a copy of the Cardo salesman's pricing sheet, a road map to the customer's house, and a quality control report to be completed by the customer. (Arce Dep. 49:23-25; 50:1-4.) Installation crews must call their manager between 1:00 pm and 2:00 pm to let the manager know whether they will complete the job that day. (Arce Dep. 75:23-25; 76:1-4.) Plaintiff contends that some Cardo installers work seven days per week, but six days per week is mandatory. (Arce Dep. 97:10-14.) Installation crews work from seven in the morning when they are required to pick up windows for each window installation job at one of Cardo's warehouses, until six, seven or eight o'clock at night, when they are required to call their manager to record their hours and report whether the job was completed. (Arce Dep. 25:23-25; 26:1—12; 98:7—13; 142:8—25; 143:1-6.) According to Plaintiff Adami, the average Cardo installer works 60 to 65 hours per week. (Arce

6

Dep. 98:18-25; 99:1.) Further, Cardo requires its installers to
complete a time request form if they want to take time off.
(Varner Dep. 75:15-22.) The Opt-In Plaintiffs, however, unlike
Adami, worked sporadically and had differing work environments
from Adami, who was a long-time core worker, as discussed below.

Defendants, in turn, contend that window installers could
exercise significant discretion over their day-to-day affairs.
Contrary to the Named Plaintiffs' claims, not every installer
was given a Cardo uniform to wear on the job. (Kern Dep. 42:15-
20.) Further, Installers are permitted to take time off whenever
they wanted to, provided that they gave the installation
managers advanced notice. (Adami Dep. 254:7-255:5; Varner Dep.
141:19-22; Belmonte Dep. 48:6-17; see also Def. Statement of
Material Facts ¶¶ 28-30.) Installers outside of Cardo's "core"
group frequently took breaks from working for Cardo to work for
other home improvement companies. (Arce Dep. 158:3-5; Czubernat
Dep. 52:24-53:12, 54:8-21; Varner Dep. 212:11-13.) Additionally,
Defendants contend that installers work a wide variety of times
for Cardo with no mandatory requirements. (Cardillo Cert. ¶ 13.)
Further, Defendants state that neither Plaintiffs Adami nor ex-
Plaintiff Varner averaged more than 8.75 working days in a 14-
day pay period during the most recent two-year period for each.
(Id.) Defendants contend that the installers, not Cardo
management, determine when installers will complete work for

Cardo, based primarily on the customer's schedule. (Deposition of John Belmonte on April 30, 2013 ("Belmonte Dep.") 38:19-23.)

Cardo's installers are paid based on stubs submitted to Cardo upon completion of individual installation jobs. After completing a window installation, Cardo installers fill out an "Installer Pay Stub" reflecting the items installed, the quantity of each item installed, the cost for installation, and a subtotal of amount owed. (Certification of Richard S. Hannye ("Hannye Cert.") Ex. 68 [Docket Item 45-4.]) Cardo's installers are paid based on the work completed. For example, installers are paid $40 for installation of one double hung window plus a $10 bonus. (Arce Dep. 50:18-19; 68:25; 80:5-11.) Cardo's installers are paid every two weeks based upon the bills that had been approved by Cardo management after cross-referencing the installer's weekly recap sheet with Cardo's weekly recap. (Arce Dep. 51:23-25; 52:1-20.) Cardo installers are not paid for their travel time, but they receive a gas allowance. (Arce Dep. 77:16-23.)

In 2010, Cardo began requiring its installers to sign a master subcontractor agreement after an audit by Cardo's workers' compensation policy carrier, Selective. (Arce Dep. 154:14-25; 155:1—25; 156:1—25; 157:1—22.) Cardo required its installers to sign the Selective Master Subcontractor Agreement on a payday and threatened to withhold paychecks until the

8

agreements were signed. (Adami Dep. 385:10-20; Varner Dep. 178:14-19.) Plaintiff Adami claims he did not read the Selective Master Subcontractor Agreement before signing it and was not allowed to keep a copy of what he had signed. (Adami Dep. 385:5-11; 387:6-13.) Plaintiff contends that many aspects of the Selective Master Subcontractor Agreement conflict with Cardo's actual treatment of its installers including assignment of work and compensation. (Hannye Cert. ¶¶ 163-207.) Defendants note that Adami had signed independent contractor agreements upon starting work with Cardo. (See Adami Independent Contractor Agreements [Docket Items 210-21, 210-23].) Whether the Opt-In Plaintiffs understood and signed such an agreement is unclear from the record at present.

**B. Procedural History**

On May 10, 2012, Plaintiff Fred Adami, individually and on behalf of all others similarly situated, filed a putative collective action and class action against Defendants Cardo Windows, Inc. d/b/a "Castle 'The Window People,'" Christopher Cardillo, Sr., Christopher Cardillo, Jr., Nicholas Cardillo, Edward Jones, John J. Belmonte, and Pat Tricocci. [Docket Item 1.] Plaintiff asserted claims under the Fair Labor Standards, Act ("FLSA"), New Jersey Wage and Hour Law ("NJWHL"), New Jersey Construction Industry Independent Contractor Act ("CIIC"), and the Employee Retirement Income Security Act ("ERISA"). Plaintiff

also asserted claims for injunctive relief requiring Cardo to
pay federal and state taxes on behalf of plaintiffs and comply
with FLSA, NJWHL, CIIC, and ERISA in the future. Defendants
filed an Answer on June 22, 2012 and Cardo asserted counter-
claims against Fred Adami, including a claim for breach of
contract.[3] [Docket Item 6.] On July 12, 2012, Plaintiff Adami
filed an Answer to Cardo's counter-claims. [Docket Item 9.]
Plaintiff filed an Amended Complaint on November 27, 2012,
adding a second Plaintiff, Jack Varner,[4] and an additional
Defendant, Nicholas Brucato. [Docket Item 18.] On December 11,
2012, Defendants filed a partial motion to dismiss Plaintiffs'
Amended Complaint. [Docket Item 22.] The Court granted in part
and denied in part Defendants' partial motion to dismiss,
dismissing Counts VI and X, for failure to maintain records
under the FLSA and NJWHL; Counts III and IX, for violation of §
502(a)(3) of ERISA; and Count XIII, for wrongful discharge.
[Docket Items 60 & 61.]

   After the close of all fact discovery on certification
issues, Plaintiffs filed a motion for conditional certification
of an FLSA "opt-in" collective action and certification of Rule

---

[3] Cardo also asserted counter-claims against Adami for fraud,
conversion, and tortious interference with contract. [Docket
Item 6.]
[4] As noted above, Mr. Varner is no longer a party to this case as
of March 16, 2016.

23 "opt-out" state wage class action. [Docket Item 43.]
Defendants also filed an Answer to Plaintiffs' Amended Complaint
in which Cardo asserted a counter-claim against Jack Varner for
breach of contract. [Docket Item 69.] In response, Plaintiffs
filed a motion to dismiss Cardo's counter-claims against Adami
and Varner for breach of contract. [Docket Item 74.]

Following oral argument and supplemental briefing, the
Court granted in part Plaintiffs' motion for a conditional
certification of an FLSA collective action[5] and denied
Plaintiffs' motion to certify a Rule 23 state wage class,
without prejudice to renewing the motion for class certification
after the Supreme Court of New Jersey addresses the NJWHL issue
of determining whether an individual is an employee or an
independent contractor. The Court also granted in part and
denied in part Plaintiffs' motion to dismiss Defendant Cardo
Windows, Inc.'s counter-claims, dismissing claims for breach of
contract against Plaintiff Varner but permitting claims for
breach of contract against Plaintiff Adami to move forward.
[Docket Items 112 & 113.] On April 14, 2014, following briefing

---

[5] The Court defined membership in the conditional FLSA collective
action as follows: "All individuals who installed windows for
Cardo Windows, Inc. at any time during the three (3) years prior
to the notice date. Excluded from the collective action
definition are all 'helpers,' as well as installers who signed
mandatory arbitration and/or class action waiver agreements."
Adami v. Cardo Windows, Inc., 299 F.R.D. 68, 82 (D.N.J. 2014).

11

and oral argument, the Court approved a form of collective action notice to be sent to potential collective action members within seven days. [Docket Item 137.] Seven installers filed consent forms to join Plaintiffs Adami and Varner's conditional collective action [See Docket Items 140, 141, 142, 143, 146, 150, and 154] but Plaintiffs are now only advancing claims on behalf of two opt-in Plaintiffs, Kevin Kern and Tadelisz Czubernat.

Thereafter, the parties cross-moved for summary judgment on Plaintiffs' individual claims and Defendants' counter-claims against Plaintiff Adami. [Docket Items 87 & 88.] On June 10, 2014, the Court granted in part and denied in part the motions. [Docket Items 152 & 153.] In particular, the Court granted summary judgment as to Plaintiff Adami's defamation claim and Defendants' counter-claim for tortious interference with contractual relations against Adami; denied summary judgment as to Plaintiffs' claims for unjust enrichment and Defendants' counter-claims for fraud, conversion, and conspiracy against Adami. The Court deferred and later denied Defendants' motion for summary judgment to the extent that it is based on Plaintiffs' failure to provide a reasonable estimate of damages, after Plaintiff Adami, on his second attempt, furnished the factual grounds for such an estimate. [Docket Items 175 & 176, 188.]

III. DISCUSSION

   A. Final Collective Certification Standard

   The FLSA requires employers to pay overtime compensation
for an employee's work in excess of 40 hours per week. 29 U.S.C.
§ 207. The statute also permits "similarly situated" employees
to sue collectively for violations of this provision. Id. §
216(b). Unlike class actions under Fed. R. Civ. P. 23, the FLSA
requires collective action members to affirmatively opt in to
the case. Id. Courts in the Third Circuit follow a two-step
process for deciding whether an action may proceed as a
collective action under the FLSA. Camesi v. Univ. of Pittsburgh
Med. Ctr., 729 F.3d 239, 243 (3d Cir. 2013); Zavala v. Wal-Mart
Stores Inc., 691 F.3d 527, 535 (3d Cir. 2012).

   Plaintiff's case has already progressed past the first
step, conditional certification or the "notice stage." Morisky
v. Pub. Serv. Elec. & Gas Co., 111 F. Supp. 2d 493, 497 (D.N.J.
2000). This Court found that Plaintiff had made at least a
"modest factual showing" that the employees identified in his
complaint are "similarly situated" by "produc[ing] some
evidence, beyond pure speculation, of a factual nexus between
the manner in which the employer's alleged policy affected
[Plaintiffs] and the manner in which it affected other
employees." Zavala, 691 F.3d at 536 n. 4 (quoting Symczyk v.
Genesis HealthCare Corp., 656 F.3d 189, 193 (3d Cir. 2011) rev'd

13

on other grounds, Symczyk, 133 S. Ct. at 1526 (internal
quotations omitted)). See Adami v. Cardo Windows, Inc., 299
F.R.D. 68, 81-82 (D.N.J. 2014) (granting Plaintiffs' motion for
conditional certification of an FLSA collective action).

Now the Court has reached the second stage, where, after
notice, opt-in, and further discovery, it is prepared to make "a
conclusive determination as to whether each plaintiff who has
opted in to the collective action is in fact similarly situated
to the named plaintiff." Symczyk, 656 F.3d at 193.[6] At the final
certification step, the plaintiff has the burden of establishing
by a preponderance of the evidence that the plaintiff and the
opt-in plaintiffs are similarly situated. Zavala, 691 F.3d at
536. If the plaintiff satisfies this burden, the case may
proceed as a collective action. Symczyk, 656 F.3d at 193.

**B. Similarly Situated**

---

[6] Plaintiffs cite to Hannye and Varner certifications in their
Brief in Support of Plaintiffs' Motion for Certification of an
FLSA Collective Action, but it is unclear to which submissions
Plaintiffs refer; Plaintiffs submitted only a short
"Certification of Richard S. Hannye in Support of Plaintiffs'
Motion for Final Certification of an FLSA Collective Action"
[Docket Item 199-2] accompanied by two exhibits along with their
Motion for Certification. The Court assumes that Plaintiffs
intend to cite to the certifications submitted in support of
their motion for conditional certification of an FLSA collective
action. [Docket Items 43, 43-1, and 45-1.] The Court notes that
Third Circuit precedent is clear that the final certification
decision should be made "with the benefit of a much thicker
record than it had at the notice stage." Symczyk, 656 F.3d at
193.

As explained above, this conditionally-certified collective action has one Named Plaintiff (Adami) and two Opt-In Plaintiffs (Kern and Czubernat). To determine whether the Named and Opt-In Plaintiffs are similarly situated, the Court must make a factual determination on a case-by-case basis considering all the relevant factors. Zavala, 691 F.3d at 536. The relevant factors include, but are not limited to, "whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment." Id. at 536-37. "Plaintiffs may also be found dissimilar based on the existence of individualized defenses." Id. at 537. Additionally, courts consider whether collective treatment will achieve the primary objectives of a § 216(b) collective action: "(1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." Moss v. Crawford & Co., 201 F.R.D. 398, 410 (W.D. Pa. 2000) (citing Hoffmann-La Roche, Inc. v. Sperling, 493 U.S 165, 170 (1989)).

This Court previously found that Plaintiff had produced "some evidence" that all of Cardo's window installers are similarly situated in order to conditionally certify a

collective action. After completion of all certification discovery and considering all the relevant factors, however, this Court now finds that Opt-In Plaintiffs Kern and Czubernat are not similarly situated to Named Plaintiff Adami. Accordingly, the Court and will not finally certify Plaintiff's FLSA collective action. Although Plaintiff has adequately shown that all of Cardo's window installers were subject to some common employer practices, they have failed to present sufficient evidence that the circumstances of the Opt-In Plaintiffs' employment are similar to the Named Plaintiff's, or that resolution of this three-member collective action would likely be more efficient than separate actions.

### a. Department, division, and location; similar claims and form of relief

There can be no dispute that Plaintiff presents evidence that the window installers who fall within this Court's definition of the conditionally-certified class satisfy some of the factors identified by the Third Circuit in <u>Zavala</u> to demonstrate similarity: Plaintiffs Adami, Kern, and Czubernat all served as window installers for Cardo Windows during the relevant time period in the same geographic area; Plaintiffs all performed the same tasks as window installers; Plaintiffs have demonstrated that Cardo had a uniform practice of selecting, classifying, training, managing, and compensating its window

16

installers; and Plaintiffs all bring claims for unpaid overtime
compensation and seek the same type of monetary and injunctive
relief, although for vastly different amounts of compensation.
Unlike in Bamgbose, where the court found a putative class of
healthcare workers not similarly situated because the workers
had "a wide array of skills, responsibilities, and experiences"
with the alleged employer, Cardo's window installers performed
the same essential task, including meeting at Cardo's warehouse,
following the same installation protocol at customers' homes,
and receiving payment on a piece-rate basis per window
installed. 684 F. Supp. 2d at 669. See also Jarosz v. St. Mary
Medical Ctr., Case No. 10-3330, 2014 WL 4722614 (E.D. Pa. Sept.
22, 2014) (decertifying an FLSA collective action where
plaintiffs "held a variety of different positions in many
different departments, and worked under numerous supervisors.").

**b. Circumstances of Employment**

However, Plaintiff has not shown by a preponderance of the
evidence that other aspects of the Opt-In Plaintiffs'
circumstances of employment are similar enough to his to warrant
final certification as a collective action. Nearly all of
Plaintiff's evidence describes the working relationship between
Adami and Cardo Windows; Defendants, on the other hand, offer an
abundance of evidence that Plaintiff Adami's employment was the

17

exception rather than the rule for window installers, including these Opt-In Plaintiffs.

Plaintiff must ultimately show that all members of the class are all <u>employees</u> covered by the FLSA. The FLSA defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1); <u>Martin v. Selker Bros., Inc.</u>, 949 F.2d 1286, 1293 (3d Cir. 1991). Courts interpret the FLSA to apply broadly, consistent with Congress's purpose to enforce minimum standards of decency for workers. <u>Alamo Found. v. Sec'y of Labor</u>, 471 U.S. 290, 296 (1985). However, the FLSA does not transform every working relationship into an employer-employee relationship. A person who works "for [his] own advantage on the premises of another" is not an employee within the meaning of the FLSA. <u>Walling v. Portland Terminal Co.</u>, 330 U.S. 148, 152 (1947).

The Supreme Court has instructed courts to look to the "circumstances of the whole activity" to determine whether an employment relationship exists. <u>Rutherford Food Corp. v. McComb</u>, 331 U.S. 722, 730 (1947). The Third Circuit has established several non-dispositive criteria to evaluate whether a worker is an employee under the FLSA: (1) the degree of the alleged employer's right to control the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his

18

task, or his employment of helpers; (4) whether the service rendered requires a special skill; (5) the degree of permanence of the working relationship; and (6) whether the service rendered is an integral part of the alleged employer's business. Martin, 949 F.2d at 1293. The presence or absence of any particular factor is not dispositive of an individual's employee or independent contractor status. Id. Additionally, the court should consider "whether, as a matter of economic reality, the individuals are dependent upon the business to which they render service." Martin, 949 F.2d at 1293 (citing Donovan v. DialAmerica Mktg., Inc., 757 F.2d 1376, 1382-83 (3d Cir. 1985) (internal quotations omitted)). In the context of a motion for certification of a collective action, the Court must determine whether the proof to demonstrate that individuals are employees rather than independent contractors can be applied to collective action members as a whole. Bamgbose v. Delta-T Grp., Inc., 684 F. Supp. 2d 660, 668-69 (E.D. Pa. 2010).[7]

Plaintiff argues principally that window installers are employees of Cardo for purposes of the FLSA because consistent

---

[7] Defendants contend that the employment analysis is too fact-specific and complex for the Court to undertake on a class basis, making a collective action under the FLSA inappropriate. (Def. Br. at 11-12.) The Court disagrees. At this juncture, only two Named and two Opt-In Plaintiffs seek certification as a collective action. Such a limited inquiry is well within the Court's ability.

evidence shows that the company exhibits a high degree of
control over the installers' day-to-day lives, because the
company provides all the necessary materials to the installers,
and because the installers' job is integral to the company's
business. (Pl. Br. at 8-10.) Moreover, Plaintiff maintains that
installers should be considered employees for the purpose of the
FLSA because they are employees for state payroll tax purposes.
(Pl. Br. at 4.) While Cardo has never withheld federal income
taxes from its installers' wages, the company withholds New
Jersey and Pennsylvania payroll taxes from the pay of installers
who are residents of those states. (Cardillo Dep. 109:19-25).
Cardo began withholding New Jersey payroll taxes at the state's
direction. (Arce Dep. 159:13-160:9; Cardillo Dep. 110:22-
111:13.)

       Defendants argue, on the other hand, that Plaintiff's
action should not be permitted to proceed as a collective action
because evidence assessing a window installers' working
relationship with Cardo cannot be applied on a class-wide basis.
(Def. Br. at 9.) Additionally, because the degree of permanence
of the working relationship between Cardo and the Named and Opt-
In Plaintiffs varied widely, because the opportunity for profit
or loss varied widely with each Plaintiff, and because the
Plaintiffs varied in their investment in equipment, Cardo's
window installers are more like independent contractors than

                              20

employees. (Def. Br. at 13-16.) Moreover, treating window
installers as independent contractors is the industry norm.
(Def. Br. at 6; see also Adami Dep. 18:1-19:15; Czubernat Dep.
25:1-6, 28:7-18, 33:13-34:8, 35:15-36:5; Belmonte Dep. 180:3-
181:24; Cardillo, Jr. Dep. 120:13-122:2.)

     Although this Court found that Plaintiff had shown at least
some evidence of an employer-employee relationship between Cardo
and its window installers on the lenient evidentiary standard at
conditional certification, the Court is not convinced that he
has carried his heavier burden at the final certification stage
of showing that all Plaintiffs, Named and Opt-in, are properly
considered employees rather than independent contractors and
thus entitled to relief under the FLSA. Although the record
contains evidence that some aspects of the window installers'
working relationship with Cardo resembled an employer-employee
relationship, the record overwhelmingly paints a mixed picture
of the window installers' independent contractor status,
especially with respect to the Opt-In Plaintiffs. More
importantly, the Court is not satisfied by Plaintiff's recycled
certifications that evidence of an employer-employee
relationship can be applied on a class-wide basis to all window
installers, warranting collective action status. Rather,
Plaintiff's submissions focus almost exclusively on Adami's
employment with Cardo, while the record as a whole suggests that

21

his working relationship with Cardo differed in fundamental ways from the Opt-In Plaintiffs' relationships.

### 1. Degree of Control

With respect to the first Martin factor, courts consider such facts as "the degree of supervision over the worker, control over the worker's schedule, and instruction as to how the worker is to perform his duties." Zanes v. Flagship Resort Development, Case No. 09-3736, 2012 WL 589556, at *5 (D.N.J. Feb. 22, 2012). The record contains conflicting evidence of Cardo's control over the day-to-day lives of its window installers; the Opt-In Plaintiffs' testimony differs from the anecdotal evidence offered by the Named Plaintiffs in significant ways.

Plaintiff contends that window installers had to arrive at Cardo's warehouse at 7:00 a.m. every day, including Saturdays, in order to unload windows from the manufacturer's truck and to pick up that day's assigned job. (Varner Cert. ¶ 3; see also Adami Dep. 236:8-20; Arce Dep. 49:23-25; 50:1-4.) Installers were required to meet with managers every morning to discuss the previous day's installation and call their managers twice a day while working. (Arce Dep. 49:4-15, 75:23-25; 76:1-4.) According to former Plaintiff Varner, installers were required to wear clothing with Cardo logos, display Cardo signage on their trucks, put up Cardo signs at customers' houses during

22

installation, and tell customers that they were Cardo
"employees" who worked only for Cardo. (Varner Cert. ¶¶ 10, 17;
see also Arce Dep. 83:9-17, 151:8-152:14.) Further, installers
were required to request time off from their managers in advance
while Cardo could cancel planned jobs at the last minute.
(Varner Cert. ¶¶ 11, 17.)

   Plaintiff further asserts that Cardo directed nearly every
detail in the way window installers completed their jobs;
Cardo's installers were required to follow Cardo's apparently
unique external installation method at every job. While the
industry standard method is to install windows from the inside
of the house, Cardo trained its installers to instead install
windows from the outside to minimize damage to the home. (Arce
Dep. 81:24-83:3.) Rod Arce testified that Cardo's process
further required the use of drop cloths, cleaning glass and
frames, caulking inside and outside the window, and vacuuming,
practices not required by other window companies. (Id.) New
installers had to come to Cardo's Mount Laurel office to train
with one of the core installers and had to every installation
job inspected by John Belmonte for "a couple weeks at the very
least" before they were allowed out on their own. (Arce Dep.
87:8-88:2.)

   However, the record is replete with evidence showing that
all of the Plaintiffs worked far less than the five or six days

a week claimed elsewhere. Defendants contend that installers work a wide variety of times for Cardo with no mandatory requirements. (Cardillo Cert. ¶ 13.) According to Defendants, the installers, not Cardo management, determine when installers will complete work for Cardo, based primarily on the customer's schedule. (Deposition of John Belmonte on April 30, 2013 ("Belmonte Dep.") 38:19-23.) It is undisputed that installers were only assigned work when they had confirmed their availability and could take time off whenever they needed, provided that they gave advanced notice. (See Adami Dep. 254:7-255:5; Varner Dep. 141:19-22; Belmonte Dep. 48:6-17; see also Def. Statement of Material Facts ¶¶ 28-30). Plaintiff Adami admitted on the record that nothing in his agreement with Cardo required that he work six days per week or on Saturdays. (Adami Dep. 360:19-24.)

The record shows that Opt-In Plaintiffs took breaks from working for Cardo and returned as they pleased. (Arce Dep. 158:3-5; Czubernat Dep. 52:24-53:12, 54:8-21.) Additionally, Opt-In Plaintiffs testified that they was not provided with a Cardo uniform to wear on the job, undercutting Plaintiffs' contention that Cardo dictated all window installers' uniforms. (Kern Dep. 42:15-20.) Further, it is undisputed that it was at each installers' discretion whether to hire helpers for a "crew," how many helpers to use, and how much to pay each

24

helper, or whether to employ an alternate working arrangement, such as Opt-In Plaintiff Czubernat's LLC. (Adami Dep. 263:2-20; Kern Dep. 26:9-27:6; Czubernat Dep. 25:13-26:3, 28:19-29:12, 59:16-25, 93:4-20.) In light of these instances of discretion afforded window installers, the Court finds that Cardo's control over the manner of its window installers' work paints a mixed picture whether all three men are Cardo's employees.

## 2. Opportunities for Profit or Loss

The second of the <u>Martin</u> factors looks to whether each Plaintiff had meaningful opportunities to gain profits or incur losses depending on his managerial skill. 949 F.2d at 1294. "This factor may be present for a worker whose earnings are tied to his performance or when the putative employee makes a capital investment that may be lost if the business does not succeed." <u>Cherichetti v. PJ Endicott Co.</u>, 906 F. Supp. 312, 317 (D. Del. 2012). When workers can exercise "initiative, business judgment, or foresight in their activities," they are more likely to be found independent contractors rather than employees. <u>Donovan v. DialAmerica Marketing, Inc.</u>, 757 F.2d 1376, 1381 (3d Cir. 1985).

Defendants contend that opportunities for profit or loss varied with respect to each installer because installers had the "ability to control his profitability through the use of crews of up to four helpers . . . and by determining how much he paid each helper." (Def. Br. at 14.) The record shows that each

installer had discretion to hire helpers if he so chose, and to determine how many helpers and what each would be paid from the installer's fee from Cardo. (Adami Dep. 264:2-20; Kern Dep. 26:9-27:6.) This is factually similar to Donovan, where the Third Circuit determined that individuals who distributed materials to others for work purposes were independent contractors in part because these distributors recruited their own middlemen, were responsible for paying their middlemen's expenses, and "had the authority to set the rate at which its [middlemen] would be paid." 757 F.2d at 1386.

However, it is uncontested that Cardo paid its window installers on a piece-rate basis depending on which windows a customer had already purchased for installation. (Varner Cert. ¶ 29; see also Arce Dep. 50:18-19; 68:25; 80:5-11; Czubernat Dep. 28:7-8.) Cardo's installers are paid every two weeks based upon the bills that had been approved by Cardo management after cross-referencing the installer's weekly recap sheet with Cardo's weekly recap. (Arce Dep. 51:23-25; 52:1-20.) As in Martin, where the Third Circuit upheld a determination that service station operators were employees under the FLSA in part because "the income of the various operators was derived primarily from their fixed commission from [Defendant]," Cardo's window installers are paid a fixed rate per window that they install at each installation job, something beyond their

26

control. 949 F.2d at 1294. Although, as Defendants point out, installers could control the number of windows installed per day at least in part by being more skillful and efficient or by bringing along and managing more helpers, installers were constrained by the number of windows a customer had already ordered from one of Cardo's salesmen. Moreover, the record shows that installers experienced significant variation in the amount of time it takes to install a window for many reasons—simply bringing more helpers would not necessarily result in more windows installed, and thus more pay from Cardo. (Adami Dep. 262:19-263:17, 438:1-9.) More importantly, installers did not bear the risk of customer non-payment. (Arce Dep. 167:19-23.) The Court finds that, with respect to the window installers' opportunities for profit or loss, Plaintiffs have shown that window installers may be closer to employees than independent contractors, but again the picture is mixed and may depend upon individual factual determinations at trial.

### 3. Investment in Materials

The third Martin factor looks to the individual investment each worker must make to do his job; the more a worker has to invest in his work, the more likely he is to be classified as an independent contractor. 949 F.2d at 1294-95; see also Donovan, 757 F.2d at 1386-87. Cardo "provides its installers with all materials necessary for the completion of each window job,"

27

including "the windows, caulk, aluminum coil, insulation, framing material, trim, drywall and roofing materials,"(Varner Cert. ¶ 18), but the record is clear that installers were required to have their own truck, tools, and insurance. (Adami Dep. 266:11-15; Arce Dep. 81:5-13; Czubernat Dep. 43-6:12; Kern Dep. 46:5-7.). In fact, the agreement signed by every installer reads "Contractors shall provide all construction supervision, inspection, labor, tools, equipment, and anything else necessary for the execution and completion of the installation service." (Adami Dep. 362:23-363:11.) Additionally, window installers were responsible for selecting and paying helpers for help during Cardo's installation jobs. (Adami Dep. 264:2-20; Kern Dep. 26:9-27:6.) While the value of that investment in truck, tools, and manpower varied widely between the three Plaintiffs, the Court finds the fact that an individual seeking work with Cardo could not attain the position of installer without at least some investment in a truck and tools on his own behalf persuasive in concluding that this factor suggests that Cardo's window installers are independent contractors. The portable nature of these investments also suggests that an installer would not be regarded as tied to Cardo but capable of working elsewhere with his truck and tools.

### 4. Special Skill

Next, courts examine whether a worker needs special skills or a high level of training to perform his job; "[r]outine work which requires industry and efficiency is not indicative of independence and nonemployee status." Martin, 949 F.2d at 1295. Window installation must be learned, and it is beyond the ken of most ordinary laborers. But it is also not a "special skill" in the sense of requiring long training or apprenticeship. While Cardo does not require all new hires to have experience in installing windows, the record suggests that nearly all of Cardo's window installers have prior experience in the field. (Arce Dep. 81:14-20.) Those without this skill may be hired as helpers. The three remaining Plaintiffs probably have about the same skill set in planning and executing a window installation. The Court finds this suggestive that no unusual degree of special skill was required for the job, counseling in favor of employee status.

### 5. Degree of Permanence

The next Martin factor looks to the permanence of the working relationship between the worker and his putative employer. 949 F.2d at 1295. Defendants submit overwhelming evidence that the Opt-In Plaintiffs' working relationship with Cardo was much less permanent than the Plaintiff Adami's. While Plaintiff Adami worked for Cardo for approximately 10 years, Opt-In Plaintiffs Kern and Czubernat each testified that they

29

worked "on and off" for a handful of days each. This is
apparently consistent with most installers' experience, as over
half of Cardo's workforce remained with the company for only a
few months. (Adami Dep. 248:14-18, 294:1-3; Arce Dep. 80:22-
81:4; Cardillo Dep. 57:2-11.) The Court finds this short term
inconsistent with the "length and continuity characteristic of
employment," Martin, 949 F.2d at 1295, and instead suggestive of
the window installers' independent contractor status. In any
event, the factor will likely lead to different results for
Adami than for the Opt-In Plaintiffs, making collective
adjudication of their claims inappropriate.

### 6. Integral Part of Employer's Business

The last of the Martin factors looks to whether the
workers' job is integral to the alleged employer's business. 949
F.2d at 1295-96; Donovan, 757 F.2d at 1385. This is undisputed.
(See Arce Dep. 149:21-24.) This suggests that Cardo's window
installers are more like employees.

### 7. Economic Reality

Finally, and most importantly, courts look to whether "as a
matter of economic reality, the workers at issue are dependent
upon the business to which they render service." Donovan, 757
F.2d at 1385. In other words, courts determine "whether the
workers are dependent on a particular business or organization
for their continued employment," or whether the workers are in a

30

position to offer their services to other different businesses. Id.[8]

Here, Plaintiff Adami's relationship with Cardo differed materially from nearly every other window installer. Plaintiff Adami was considered one of Cardo's "core guys," the unusual installers who worked with Cardo on a regular basis for a period of years. (Arce Dep. 80:16-81:4.) He was a "favorite" of

_____

[8] Plaintiffs raise for the first time in their Reply Brief the issue of registration pursuant to the New Jersey Contractors' Registration Act, N.J.S.A. 56:8-136 et seq. The Act requires that all contractors must register with the Division of Consumer Affairs in order to "make or sell" home improvements. N.J.S.A. 56:8-138. Plaintiffs contend that Cardo's window installers are economically dependent on Cardo, counseling in favor of finding them to be employees, because none of the Plaintiffs were registered individually under the Act, and instead installed windows only using Cardo's license. (Reply at 1-3.) At the March 2 hearing, Plaintiffs reiterated the point that Cardo's window installers cannot work without Cardo's contractors' license, and as such are "captives of Castle." Defendants took the position that Cardo's window installers are not subject to the registration and licensing requirements of the Act, per N.J.S.A. 56:8-139, as they are not people who independently advertise "in print or put[] out any sign or card or other device . . . which would indicate to the public that he is a contractor in New Jersey." The Court is not convinced that the Act's licensing requirements counsel in favor of finding the window installers to be employees rather than independent contractors, even assuming that the Act applies to them at all. The record in this case demonstrates that Cardo's window installers were free to – and did – work for other companies, and presumably install windows using that other company's contractors' license. Plaintiffs have offered no documentary evidence that window installers could not work under another company's license as easily as they did Cardo's. Accordingly, each Plaintiffs' need (or not) of his own contractors' license and registration has no impact on the Court's analysis of the economic reality of the relationship between Cardo and its window installers.

management who got special access to desirable installation
jobs. (Belmonte Tr. 42:3-24). Plaintiff Adami had a particularly
close relationship with Rod Arce, who picked the "largest jobs"
for him (id.) and with whom he allegedly conspired to submit
fraudulent customer invoices or accept overpayment for
installation jobs in exchange for cash kickbacks. (Cardillo
Cert. ¶ 26; Cardillo Jr. Dep. 173:14-175:15.) Additionally, he
was one of few, or perhaps the only, installer who worked with
Cardo who had his own warehouse and stored Cardo material
offsite. (Belmonte Tr. 104:0-17.) Because most of Cardo's window
installers worked for the company only for short times, because
they had a fungible skill that could ensure them work elsewhere,
and because each window installer came to Cardo having already
invested in his own truck, tools, and insurance, the Court finds
that the economic reality of the relationship between most of
Cardo's window installers and the company was more like that of
an independent contractor than an employee. Again, this factor
will likely lead to different results for the Opt-In Plaintiffs
than for Adami.

### c. Other Differences and Efficiency Considerations

Finally, courts are instructed to consider "whether
collective treatment will achieve the primary objectives of a §
216(b) collective action: (1) to lower costs to the plaintiffs
through the pooling of resources; and (2) to limit the

controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." Moss v. Crawford & Co., 201 F.R.D. 398, 410 (W.D. Pa. 2000) (citing Hoffmann-La Roche, Inc. v. Sperling, 493 U.S 165, 170 (1989)). The benefits of a collective action simply are not present where the Named Plaintiff and the Opt-In Plaintiffs are so differently situated in the circumstances of their employment such that only one has presented any reasonable chance of relief under the FLSA, and where there are serious legal and factual differences between Plaintiff Adami's case and the Opt-In Plaintiffs' cases. Plaintiff Adami faces individual counterclaims in this case that go to his credibility, while neither of the Opt-In Plaintiffs do; claims against him for fraud, conversion, and conspiracy survived summary judgment and would inevitably complicate a collective trial. [Docket Items 152 & 153.] While Plaintiff Adami was able to furnish factual grounds for his estimate of damages, the Opt-In Plaintiffs have been unable to do so. Any minimal savings in time and resources that might be had in adjudicating one collective action on Cardo's practice of classifying its window installers as independent contractors rather than employees instead of trying three smaller cases is erased when the Court considers the inevitability of three mini trials in any case. Accordingly, the Court will deny Plaintiff Adami's motion for final certification

33

of an FLSA collective action and will terminate the conditional certification previously granted in this case.

**C. Validity of Selective Master Subcontract**

Additionally, Plaintiff seeks to include all window installers who worked for Cardo in their collective action, including those who signed the class action waiver in the Master Subcontract Agreement, arguing that the agreement is unenforceable. (Pl. Br. at 18.)  Defendants take the position that this is an untimely and deficient attempt by Plaintiff to seek reconsideration of this Court's prior opinion finding that installers who signed mandatory arbitration or class action waiver agreements are not similarly situated. See Adami v. Cardo Windows, Inc., 299 F.R.D. 68, 81-82 (D.N.J. 2014) ("Similarly, Plaintiffs have not made a sufficient factual showing that installers who have signed mandatory arbitration or class action waiver agreements are similarly situated because Adami and Varner have not signed any such agreement. The named Plaintiffs thus lack standing to contest the validity of these agreements. Therefore, the Court will exclude from the collective action definition helpers, and installers who signed mandatory arbitration and/or class action waiver agreements.")

Plaintiffs contended at the March 2 hearing that they are not seeking reconsideration of the Court's prior opinion because they offer instead an entirely new legal theory: not that

installers who signed mandatory arbitration agreements are similarly situated to Plaintiff Adami, but that the mandatory arbitration agreements are unenforceable because they are unconscionable contracts of adhesion and because they violate the policy of the FLSA and the National Labor Relations Act encouraging collective action in labor cases. If the Court follows the Fifth Circuit's reasoning in Murphy Oil USA, Inc. v. N.L.R.B., 808 F.3d 1013 (5th Cir. 2015), Plaintiffs contend, it will have to find the mandatory arbitration agreements invalid and more of Cardo's window installers will have damage claims and be eligible to join the FLSA collective action per this Court's definition of the class.

Despite this new legal theory, Plaintiffs' motion is nothing more than an attempt to relitigate the validity of the mandatory arbitration agreements in the Selective Master Subcontract. At the hearing, Plaintiffs offered no explanation for why their new theory, that the agreement violates the FLSA by discouraging collective action, could not have been raised earlier and why it should not be considered waived. As this Court has noted, "A motion for reconsideration . . . constitutes an extremely limited procedural vehicle, and does not provide the parties with an opportunity for a second bite at the apple, nor a vehicle to relitigate old matters or argue new matters that could have been raised before the court made its original

decision." Grant v. Revera Inc./Revera Health Sys., Civ. 12-5857 (JBS), 2015 WL 794992, at *2 (D.N.J. Feb. 24, 2015) (quotations and citations omitted). Moreover, as this Court already held in its conditional certification opinion, Plaintiff Adami does not have standing to contest the validity of these agreements as he never signed one himself. Adami, 299 F.R.D. at 81. Neither Opt-In Plaintiff has claimed he signed such an agreement either, so both lack standing. Because Plaintiff's request is untimely and because he does not have standing to contest the validity of the mandatory arbitration agreement, the Court will deny Plaintiff's motion to find the agreement unenforceable and include those window installers who signed it part of Plaintiff Adami's collective action.

### D. Equitable Tolling

Finally, Plaintiff also asks this Court to equitably toll the statute of limitations so that additional window installers who have not yet filed written consent to join this action may do so. (Pl. Br. at 27-32.) Again, Defendants contend that this is an untimely and deficient attempt by Plaintiffs to seek reconsideration of this Court's prior opinion finding no reason to equitably toll the FLSA statute of limitations. See Adami, 299 F.R.D. at 83.

As a motion for reconsideration, Plaintiff's motion is untimely and procedurally deficient. Motions under L. Civ. R.

36

7.1(i) must be served and filed within 14 days after the entry

of the order; Plaintiffs waited a year and a half before

requesting equitable tolling from the Court for a second time.

This alone provides a basis to deny Plaintiffs' untimely motion

for reconsideration. <u>Mitchell v. Township of Willingboro Mun.</u>

<u>Gov't</u>, 913 F. Supp. 2d 62, 78 (D.N.J. 2012).

     Notwithstanding the timeliness issue, Plaintiff's motion

for reconsideration lacks merit. The party seeking

reconsideration bears the heavy burden of demonstrating either:

"'(1) an intervening change in controlling law; (2) the

availability of new evidence not available previously; or (3)

the need to correct a clear error of law or prevent manifest

injustice.'" <u>Andreyko v. Sunrise Sr. Living, Inc.</u>, 993 F. Supp.

2d 475, 478 (D.N.J. 2014) (citing <u>Max's Seafood Café ex rel.</u>

<u>Lou-Ann, Inc. v. Quinteros</u>, 176 F.3d 669, 677 (3d Cir. 1999)).

Plaintiff's brief sets forth none of these grounds for

revisiting its earlier holding. By definition, Plaintiff has

failed to show any basis for reconsideration under L. Civ. R.

7.1(i). Accordingly, the Court will deny Plaintiff's motion for

equitable tolling.

**IV. CONCLUSION**

     An accompanying Order will be entered.


 **March 30, 2016**            **s/ Jerome B. Simandle**
Date                                JEROME B. SIMANDLE
                                           Chief U.S. District Judge